Oral argument not to exceed 15 minutes per side. Ms. I'm going to mess it up again. Ms. Delaware. Good morning, your honors. May it please the court. My name is Faith Dilesky, and I'm here on behalf of Appellant Scassa Asphalt Inc, and I have reserved two minutes for rebuttal. In this case, there was a letter of February 15, 2010, directed from the union to Scassa Asphalt Inc. That letter stated that the agreement, the union agreement to which Scassa had signed and had orally reneged, was set to expire April 30, 2010. Scassa, even though they had thought that all relationship had already been severed with the union, took this agreement basically to say, you know, it is expiring as of April 30th, you know, there's no need to do anything further. The letter went on to say this is to advise you of our desire to modify, amend, and or negotiate a new agreement. It is our desire to open negotiations for a new agreement covering wages, hours, and conditions of employment. And it instructed them to contact them for purposes of negotiating if they desire to do so. They did not desire to enter into a new agreement, so they took no further action. Both the layman definition and the legal definition for expire include the term terminate. And so reasonably, Scassa understood this to be the 60-day in advance notice that the agreement was terminating. I think it's also important to note that there were no other statements or invoices, requests for contributions, delinquency notices, or any other correspondence of any other kind that Scassa had received from either the union or the funds, which would have manifested the intent that there was still a contract in place. And then the funds waited until December of 2012 in which to file this particular matter. Scassa didn't learn of it until March of 2013, and at that point in time, you know, they were taken by surprise because they didn't even realize there was, you know, allegedly an agreement still in place. Most of the cases in this area and the cases cited by appellees cite notices that were sent by the employers for the proposition that they were terminating. However, in this case, it's a little bit different because the notice in this case is a notice that was from the union to the employer. And so I was able to find a case that was similar, and that was the Broad Home Systems versus International Brotherhood of Firemen and Oilers out of the Fifth Circuit. And in that case, the original agreement also contained an evergreen provision. And the notice that the union sent in that case stated, in accordance with the provisions of the current agreement between Local 283, we wish to open the contract for purposes of changes and modifications. We stand ready to meet you at our earliest mutual convenience. Please contact us to set up a meeting date. They never did contact them, and in fact, in that case, the head of the employer circled on his calendar and said, contract terminated, and put that date on there. Did the union or whoever it was that sent the letter, did they say that they wanted to modify the previous agreement and the one from the Fifth Circuit? Theirs just said that they wish to open the contract for purposes of changes and modifications in the Seventh Circuit case. What's your best Sixth Circuit case on that to show that would be a termination? I really didn't find any Sixth Circuit cases which dealt with the specific case of a union sending a letter. It was usually cases in which the employer sent the letter. And there were cases where it found, you know, the employer did unequivocally convey the intent to terminate. However, you know, in this instance, it's a unique case because the letter is coming from the union. And in looking at this case... Isn't that the whole purpose of Section 515 is to say that conduct of the union does not alter a contractual obligation to a fund, and the fund continues to be enabled to collect on that contractual obligation? Well, in this case, it's the express intent that the contract expires, which, again, a reasonable reading of that based upon what the term expire means is to terminate. But isn't the difficulty, though, that your client signed both the short-form agreement and sent the letter to the funds saying that I will, in fact, make payments and I am bound to the requirements and that both those have an evergreen clause that required your client to terminate his agreement to pay into the funds without regard to what someone else in the union had said because 515 states that very purpose that funds need to be able to collect because they owe the responsibility of coverage regardless of what the union says. I'm not hearing anything that takes you out of the very purpose and intent of Section 515. Well, and that, I'll kind of segue into, that kind of leads into the other assignments of error, which you had mentioned the other letter. There was the short-form agreement that our client signed, and that was on February 6th of 2009. Then they drafted a letter on February 7th, and, again, this was drafted by Nicholas Skaza, who is the owner of Skaza Asphalt. I mean, this is kind of a three-man operation. It was run by Nick Skaza. His brother, Ettore, also worked on it, and they would have a laborer here and there help them out, basically doing small jobs for municipalities. The letter that they wrote then on the 7th but wasn't finalized until and sent until after February 13th was just a one-sided promise on the part of Skaza for the purposes of funding Nicholas Skaza's pension benefits, and that was the 2,000-hour letter that said, you know, we will contribute 2,000 hours for the purposes of funding the principal operating engineer Nicholas Skaza's benefits. Why would someone such as Nicholas Skaza sign the 2,000-hour promised contribution? Was he getting something as a benefit in return? What he understood was that by doing that, basically, his company would be paying to fund his pension and benefit package. For his own. For his own benefit. He was the primary beneficiary of that. Correct. He was the primary beneficiary, and this is a very unusual case in that, you know, so he was... That would be the benefit then. That was what he was... That would be why he was signing this. Right. That was what his understanding was based upon the meeting with the union representative when they had explained things. So that was a later letter that he had sent, but, you know, no contributions were ever made, no payments were ever made to Nicholas Skaza, and yet he... But did he make contributions? No, he did not. There were no... So there was no payments. Right. There were... Exactly. But, I mean, and that's kind of the point is, you know, there's the alleged damages here are that payments needed to be made out, and, for instance, in the cases that have been cited by Eppley, you know, Gerber Trucking, for instance, it's the whole point for the funds is, as you had mentioned, was it's defined benefits in, defined benefits out. However, in this case, you know, the funds are suing because they're saying we never got the defined benefits in, but there were no benefits going out under this 2,000-hour agreement. You know, Nicholas Skaza, Skaza Asphalt never paid anything in. Nicholas Skaza never received anything out. But that's not the standard that the Department of Labor enforces, is it? Isn't the Department of Labor's enforcement, if you have a contractual agreement for an employee's coverage, the fund has to provide that, whether someone gives the contributions or not. So isn't the law that it's incumbent on the fund to go out and collect that because they're required to fund it, whether they receive the contributions or not? And that's where the argument goes with both, you know, with the Gerber case, for instance, and that holding. It's that, you know, in the case, for instance, of a company where you've got employees who've been promised benefits, there are third-party beneficiaries who are relying on that promise. So those holdings are premised on cases such as that, whereas in this case, it's the unique situation in that the person who's made the promise is the only one for whom it would benefit and the one who would be personally liable for purposes of the bond on it. So he would be paying out for something that he is not going to be receiving. But it's always possible that he would have hired on more people and they'd have been covered too, right, under those circumstances? I know it didn't happen, but he could have hired on 20 more people and they'd all been covered, right? Under the original union agreement, as opposed to the 2,000-hour letter, you know, if he had conceivably hired a bunch of union operators, that could have conceivably been the case. So the original agreement had provisions that would be funding some of these separate funds for the people who were working at SCAZA? Yeah, the original agreement was just the Ohio Heavy Highway Agreement, you know, standard agreement, and this was basically a short-form agreement that SCAZA Asphalt had signed, and that would have covered the others. Then a week later, based upon their understanding that this would be solely for Nick SCAZA's benefit, because they really did, there was no dispute that there wasn't much work that was performed. Nick SCAZA never worked anywhere near 2,000 hours, and that's undisputed in the audit findings. However, you know, the audit findings have been inflated to include those 2,000 hours. Do you have any case that would say, assuming that you're wrong on whether you're bound by the requirement of a written termination, do you have any case that would say that once the company becomes defunct, that then the obligations cease? No, Your Honor, I do not. And I can't remember from the record, what is the record evidence about the SCAZA company becoming defunct? What exactly happened? It was the affidavit of Nicholas SCAZA, basically, that they were winding down business. In 2010, they were significantly winding down business and had ceased all operations by January 2012. It may be the case that by the Secretary of State's website, I think SCAZA Asphalt may still be on the books, only because of the statutory requirement that you can't still owe taxes and officially dissolve a corporation. So the company does owe taxes, you believe? Yeah, they still, I believe, have some tax obligations to the state of Ohio, which has prevented them from completely shutting down the company officially. But like I said, there's been no work performed since 2012, and they're an asphalt company. What is the record that shows that? Again, that was just the affidavit of Nicholas SCAZA. And this is an incorporated entity in Ohio? Yes, and it's an Ohio corporation. Thank you. Thank you. Good morning, and may it please the Court. I'm Dan Clark on behalf of the administrator and trustees of the Ohio Operating Engineers Fringe Benefit Funds. I think it would be helpful maybe to start with a little explanation of the different agreements and their purpose that are at issue. The Highway Heavy Agreement is the initial primary agreement that Mr. SCAZA entered into with the Operating Engineers Union. This is a standard agreement offered by the union to contractors within the state of Ohio performing road construction, heavy highway work, anything from asphalt resurfacing to bridge and road construction, crane operation. Under that agreement, the employer, SCAZA Asphalt, agrees to pay contributions to the Fringe Benefit Funds to provide pension benefits, health and welfare benefits, and other fringe benefits to any employees performing the work of an operating engineer. So if SCAZA Asphalt had hired 20 people to perform operating engineer work on a road resurfacing project, contributions would be due on behalf of all of those employees. And benefits then would be payable for those employees at some point? That's correct. What kind of benefits? Are there pension benefits, health benefits? Pension benefits under a pension plan. It's a defined benefit pension plan. You work X number of hours for X number of years, and it would calculate your benefit depending on the date of your retirement. Health and welfare benefits are earned and provided more in real time. Once you work a certain number of hours, you're covered under the health and welfare plan. You have health insurance, and the Fringe Benefit Office in Columbus is your insurance company. They pay your claims to provide your health insurance. The 2,000-hour agreement, the additional agreement that Mr. SCAZA signed in this case, is something that is provided for uniquely in owner-operator businesses where there's maybe only, in some cases, one man who runs a backhoe or a crane and owns the company, and he's the owner and the operator. He's doing the work and owning the company. Traditionally, the funds have an auditor that will go out and determine the amount of contributions due simply by looking at an employer's payroll records and saying you have 20 operators. You paid them 162 hours each last month. You would do multiplication per hour. This is what you owe. In the owner-operator context, because the operator, the individual benefiting and getting the benefits is also the individual responsible for preparing the payroll records, and because the work of that individual is both as an owner running a business, managing an enterprise, but also as an individual performing operating engineer work on a piece of equipment, there's obviously potential for under-reporting of hours worked. Mr. SCAZA would have every interest in paying himself as an employee of SCAZA for a very limited number of hours, reporting that on the payroll records, and then being compensated as an owner of the business when the company earns a profit. So to avoid all of that, the issues of where you're really working, how many hours should you pay contributions for, the 2,000-hour agreement is provided where Mr. SCAZA agrees for your time, just pay full contributions as if you were a full-time employee. So why is it in the interest of the owner-operator to agree to pay for 2,000 hours? Well, the union won't enter into the agreement without that commitment, for one, and that allows the company to gain access to work that they couldn't otherwise do if they weren't a signatory union contractor. I understand SCAZA Asphalt performs work for you. Was it a requirement of the highway heavy agreement that the owner-operator sign the 2,000-hour agreement? It was a requirement for SCAZA Asphalt if they wanted to be a signatory contractor under highway heavy to also execute the 2,000-hour commitment. That's probably something that the plan wants to simplify their audit later. If they can't find the hours, they just put it down for 2,000. Right. Certainly. For the owner-operator, that makes it easy. It's 2,000. For an employee, we just look at the payroll records and say, you know, the company, you were paid for 100 hours. We know what contributions are due. So there's one auditor for the entire state of Ohio, and there's no way to do a true investigation to have somebody on a job site saying, you know, was work really being done and how long? So this streamlines that process. So is it a requirement then? Is there a term in the highway heavy agreement saying that the owner-operator must sign a 2,000-hour agreement, or was this an oral understanding that this was a requirement? It was not in the highway heavy agreement. The highway heavy agreement is used in context much beyond the owner-operator context. These are two that go together. If you want to sign this one and be a signatory contractor, you have to make this commitment. Okay. Now, you also have to make a commitment that if you hire anybody else, and they're performing the work of an operating engineer, you also pay contributions. What's your best case that Mr. Skaza's counsel had said that she had a best case from the Fifth Circuit to show that this agreement was terminated? What's your best one to show that this was not terminated? The Chattanooga News Free Press case from the Circuit, 1975, that the notice of termination must be clear and explicit, and also that a notice of intent to modify an agreement is not equivalent of a notice of intent to terminate. That, you know, going, I guess, flipping back to the, you know, once Mr. Skaza signs that contract, the pension fund becomes obligated to provide those benefits regardless of any contributions that are ever paid. So if Mr. Skaza were to come to, you know, were to retire, I don't know how old he is, but if, you know, in 5 years or 20 years, approaches the fund office and says, I believe I've qualified for a pension under the pension fund rules because I worked 1,900 hours for Skaza Asphalt in 2010. He, you know, the pension fund can't say, can't tell him, no, you don't get those benefits because you were the owner of the company and you didn't make those contributions. The pension fund is obligated to provide those benefits as if the contributions were made. So the fact that, you know, Mr. Skaza doesn't see the value in that today doesn't relieve us of the obligation to provide the benefits and to attempt to make the contributions that are owed. What about the apparent fact that the company stopped operations in 2012 and was winding down in 2010? How should that impact? That's of no impact. So even a, say it's ceased operations, so it's in effect a defunct entity. It still has to keep on paying until it sends a written notice? Until it complies with the termination provision in the agreement. The contract, it's an evergreen clause and it goes on, yes. Has the termination provision been complied with at this point in time right now? It has not been. So you're going to be contending that you can keep on getting the contributions as of 2015? As a legal matter, yes. As a practical matter, if the company is defunct and out of business, the chances of the funds practically collecting those contributions and having the benefit of those contributions is not realistic. You may not collect this money anyway if you win, right? That's correct. Can you go after Mr. Skaza personally? We haven't done so yet. There's limited opportunities to do that. I mean, the signatory here is the corporation, so that would involve under state law looking at whether or not the corporate formality has been respected, whether assets were improperly transferred from the corporate entity to Mr. Skaza or to somebody else. But your position is that even though it's fairly clear, shall we say, from the litigation standpoint that Mr. Skaza wants to terminate this agreement, that he hasn't done so yet? He has not complied with the, to my knowledge. I don't represent the union. The notice under the contract would go to the union. He'd have to put it in writing, and he didn't do it the first time. He said this is the end of this, but he just told them, right? And he figured that was right. His testimony is that two weeks after, he said, oh, never mind, I changed my mind, I'm not doing this. If that had been in writing, that would have probably terminated, right? I mean, at some point. Yes, it would have been 60 days before. So, yes, that would have been effective. And it would have been effective right then? It would have been effective at the end of the term. The one-year term? Yes. So I think it's 60 days. You have to give notice before the term ends. And then it becomes effective at the end of that one year. It's a one-year contract. Is that it? That's correct. And the importance of the written notice, obviously, from my client's perspective, we're not the union. We don't get the benefit of that phone call or whichever that was made. If it was made and there's dozens of union employees, representatives, we have a file with Mr. Scoss's signed written agreement. And until we have a file that says here's his written notice of termination, we have Scoss Asphalt as an active signatory contractor and an obligation to provide benefits. Well, you say obligation to provide benefits, but I'm a little bit unclear what the benefits would be if it's a company that has maximum three employees where their work disappears in 2010. What kind of benefit? So nobody's working. Let's say that that's in the record. There were two audits performed by the funds in this case, one reflecting the contributions due on actual hours worked by Scoss Asphalt employees. And that was substantially less, right? Yes, $60,000. So there were, in addition to Nick Scoss, there was an E Scoss, which sounds like it might be a brother, and additionally an operator with a last name Straub who was on this audit who did work. So you are contending that the funds were, in fact, providing health insurance for these people? I don't know their specific benefit status at any given time. If they had worked a sufficient number of hours in a certain period of time, they qualify. The reason that's a little harder to answer is because these employees often get their benefits through the trust funds because they tend to move around a lot. Their road construction is seasonal. They move from one contractor to another within seasons, sometimes having multiple different employers. So rather than get your health insurance from your employer and have to switch every time you switch job sites, the employers pay into the central health fund. And then once you have sufficient contributions, that insurance will continue for a period of months or years until you don't work. As long as you continue to work and earn enough hours, you qualify or you can get benefits. But what I'm getting at is sort of the practical concern here is that arguably Skaza did not have any notice that his oral termination wasn't sufficient. And so time goes on, and then the auditor comes up three or four years later and says, oh, you haven't been paying for three or four years. And I'm just sort of curious whether practically there was a basis for Skaza to know that his employees and himself, the three of them, were getting benefits from the fund, in which case there would be much less concern about his not knowing he hadn't terminated because if his people are getting benefits, he should know that it hadn't been terminated. Is there any record evidence that would address my concern? I don't believe there's anything in the record to indicate the benefit status of any of the employees, whether or not they were making any claims of the funds or receiving any communications individually. As to the notice that Mr. Skaza had that this contract continued, in effect, and that his oral statement was insufficient, I would direct the court to the Highway Heavy Agreement itself, which states this agreement shall remain in full force, in effect, until it is expressly terminated by notice in writing. And the district court addressed this argument squarely and found that it's certainly fair to hold Mr. Skaza as a contracting party to what he agreed to in his language in the written agreement. And certainly ERISA slants the playing field dramatically in favor of my client and allowing us to rely on the written agreement and holding Mr. Skaza to this notice provision until he gives written notice he hasn't done that. If his claim seems bad, I didn't know, I didn't read it, under ERISA that that's insufficient. We have an obligation to provide the benefits. And I see that my time has expired. I thank the court for your time. Thank you. Just a couple of brief points. Appellee counsel had indicated that the best case for their position is the Chattanooga Mailers case. However, in that case, although the cited language was contained within that case, it was done in dicta. That case actually didn't analyze the notices in that particular matter but looked instead at the past practices and conduct of the parties in determining the intent in that matter. Isn't the problem, though, with some of the cases you cite that, in fact, the person in your position actually sent a written notice? Yeah, in some of those cases they had sent a notice. And a lot of times it was, you know, we want to negotiate separately. And, you know, in some cases even that was held to be a notice of sufficient notice. However, you know, most of those cases were all dealing with, again, notice sent by the employer, which in this case, you know, like I said, our client was taken aback because they got this notice. They didn't think much of it because they thought, okay, it's just reiterating what we already, you know, thought was the case. And then, you know, they hadn't received anything, heard anything. And so they had no reason to believe it was still in effect until they were, you know, taken off guard in 2013 when they received the complaint which had been forwarded to them. Did Mr. Skaza apply for a pension now from the funds? Is he entitled to draw it now? He's no longer. He was only a union member for a brief period of time. He wouldn't have qualified. So I don't know that he would. Well, isn't he still a member because he hasn't terminated according to the funds position? Well, I mean, as far as being like a card-carrying, him personally being a card-carrying member of the union, he is not. Because I think, but as far as Skaza Asphalt, Skaza Asphalt, Inc., you know, that is the position of defendants that it, you know, the company is defunct or not. That, you know, the company would be bound by the union agreement, not that Mr. Skaza was a union member. But if he was covered under this agreement, I would think he'd be entitled to collect. Because they say that it's really not the union, it's the funds that pays out the money. He doesn't have to be a union member, surely. But I think in order to participate in the funds, you have to have been a member of the union. All the time. Right, for the time period. Does the record indicate that anybody at Skaza received any benefits ever from the funds, one way or the other, that they did or did not? I don't think that there's anything in the record. There may have been something in the affidavit that Skaza Asphalt had paid. Basically, they paid prevailing wages and benefits separately because they didn't think there was any union coverage. So whenever they were on a prevailing wage job, you know, they made sure that everyone was paid prevailing wages and paid, you know, the benefit portion of that separately so that they were pretty much in the same position as if it was a union job to comply with prevailing wage provisions. And I did want to clarify, and I don't know that counsel here is aware, but I know that there has been a suit filed last September, I believe, against Merchant's Bonding Company, which is the bonding company to collect on the funds. And that is the personal guarantee for Mr. Skaza has made the personal guarantee to Merchant's Bonding. So the collection is kind of a three-way there. Your red light has been on for a while. Oh, I'm sorry. All right. Thank you, Your Honors. Thank you both for your argument. The case will be submitted with the clerk. Call the next case, please.